UNITED STATES *v.* BLOOMINGDALE BROS. & CO. (No. 2015).[1]

EVIDENCE, INVOICE As.

It can not be said that the invoice has no value whatever as evidence. Not only is it prima facie evidence of what it declares, but it is *the* evidence which determines the collector's action as to all imported merchandise which has not been examined. Where there was nothing except the invoice to show the yarn count of cotton cloths under paragraphs 253 and 252, tariff act of 1913, and the invoice was undiscredited and unimpeached, the Board of United States General Appraisers correctly presumed that the yarn count was shown by the invoice, and their decision sustaining the protest and directing reliquidation in accordance with the yarn count stated in the invoice is affirmed.

United States Court of Customs Appeals, May 1, 1920.

APPEAL from Board of United States General Appraisers, Abstract 43356.

[Affirmed.]

*Bert Hanson,* Assistant Attorney General (*Martin T. Baldwin,* special attorney, of counsel), for the United States.
*Comstock & Washburn* (*Geo. J. Puckhafer* of counsel), for appellees.

[Oral argument Feb. 27, 1920, by Mr. Baldwin and Mr. Puckhafer.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Jacquard figured cotton cloth in the piece imported at the port of New York was classified by the collector of customs as "Jacquard figured manufactures of cotton," and was therefore assessed for duty

---

[1] T. D. 38400 (38 Treas. Dec., 403).

at 30 per cent ad valorem under that part of paragraph 258 which reads as follows:

258. * * * all other Jacquard figured manufactures of cotton, or of which cotton is the component material of chief value, 30 per centum ad valorem.

The importers protested that the goods were not dutiable as "Jacquard figured manufactures of cotton," but were properly dutiable as cotton cloth "at the appropriate rate, according to condition and the average number of yarns," etc., under the provisions of paragraphs 253 and 252 of the tariff act of 1913, which said paragraphs in so far as necessary for the understanding of the issues involved, are as follows:

253. The term cotton cloth, or cloth, wherever used in the paragraphs of this schedule, unless otherwise specially provided for, shall be held to include all woven fabrics of cotton, in the piece, whether figured, fancy, or plain, and shall not include any article, finished or unfinished, made from cotton cloth. In the ascertainment of the condition of the cloth or yarn upon which the duties imposed upon cotton cloth are made to depend, the entire fabric and all parts thereof shall be included. The average number of the yarn in cotton cloth herein provided for shall be obtained by taking the length of the thread or yarn to be equal to the distance covered by it in the cloth in the condition as imported, except that all clipped threads shall be measured as if continuous; in counting the threads all ply yarns shall be separated into singles and the count taken of the total singles; the weight shall be taken after any excessive sizing is removed by boiling or other suitable process.

252. Cotton cloth, not bleached, dyed, colored, stained, painted, printed, woven figured, or mercerized, containing yarns the average number of which does not exceed number nine, 7½ per centum ad valorem; * * * exceeding number ninety-nine, 27½ per centum ad valorem. Cotton cloth, when bleached, dyed, colored, stained, painted, printed, woven figured, or mercerized, containing yarn the average number of which does not exceed number nine, 10 per centum ad valorem; * * *, exceeding number ninety-nine, 30 per centum ad valorem; * * *.

The goods were returned by the appraiser as woven cotton fabrics in the piece, woven on an ordinary loom with figured effects produced by means of the Jacquard attachment.

Between the filing of the protests in May, 1914, and the hearing thereof by the board in September, 1918, this court in United States v. Sherman & Sons (6 Ct. Cust. Appls., 271; T. D. 35501) held that goods of the kind here in controversy were more specifically provided for as woven figured cotton cloth, woven in the piece, than as Jacquard figured manufactures of cotton, and that such goods were therefore dutiable under paragraph 252 rather than under paragraph 258. Accordingly, when the protests in this case came on for hearing before the board, the decision in the Sherman case was accepted as controlling, and it only remained for the board to determine at what rate the goods should be assessed under paragraph 252, which rate in its turn, under the terms of the provision, depended on the number of the yarns and the condition of the cotton cloth.

It affirmatively appears that, as the goods were classified by the collector as Jacquard figured manufactures of cotton, no samples of the importation were retained, and consequently no representative samples of the importation were available for submission on the hearing of the protest by the board.   William H. Parkhill, an examiner in the customs service, called by the importers, testified, however, that there had been filed with him samples of other importations, the quality numbers of which were the same as those of the goods under discussion, and therefore established that such samples were of the same quality and generally representative of the cloths in controversy. Unfortunately none of those samples, with the exception of numbers 4044, 6110 and 4702/5020, was of sufficient size to permit the determination of the yarn count in accordance with the provisions of paragraph 253, and an analysis to fix the average yarn count could be made of those sample numbers only.   The official analysis set out in the record, shows, first, that the average yarn count of number 4044 was 26; that of number 6110, 62; and that of number 4702/5020, 61; second, that the remaining samples submitted were all too small for analysis.

The board overruled the protest as to those fabrics the yarn count of which was neither invoiced nor shown, and sustained it as to the fabrics invoiced as quality numbers 4044, 6110, 4702/5020 and as to those fabrics the yarn count of which was invoiced but not determinable by analysis.

The Government appealed and now asks that the board's decision be reversed in so far as it sustains the protest as to textile fabrics the yarn count of which was invoiced but not otherwise established.

In support of its appeal the Government contends in effect that the invoice required by law is no evidence whatever of the nature or character of the goods, or of any other fact determinative of the classification of imported merchandise or of the rate or amount of duty which should be imposed thereon.

We can not agree with this contention.   From 1789 down to the present time the invoice has been so necessary, so indispensable to a proper administration of the customs, that the Congress has always prescribed the presentation of an invoice as a prerequisite to the entry of imported merchandise.   Indeed, from 1789 to July 14, 1832, a period of 43 years, the invoice was in the ordinary course of business the *only* means furnished by statute to the collector for the ascertaining of the official or dutiable value of imported merchandise, and if no invoice was submitted the collector was bound to retain the importation in customs custody until a proper invoice was produced. If it was impracticable to furnish an invoice, or if the collector suspected that the invoice presented was fraudulent, he might order an

appraisal of the goods and assess duty on the appraised value.    (Secs. 13, 16, and 22, Act of July 31, 1789.)

After the passage of the act of July 14, 1832, requiring the appraisement of all ad valorem merchandise, the invoice lost some of its usefulness in the ascertainment of values, but its worth and importance to the collector in determining the kind and character of imported goods and the amount of the dutiable fees and charges thereon continued through all the tariff acts down to and including those now in force.   Indeed, the invoice is now so essential to a proper administration of customs laws that, in cases where it is impracticable to produce a regular invoice, the importer must file his affidavit to that effect and present to the collector his pro forma invoice verified by his oath, and the collector is empowered to examine him under oath, as to such pro forma invoice, and unless the collector be satisfied that the failure to produce a duly certified invoice is due to causes beyond the control of the importer, entry of the merchandise may be denied.   And besides all that, any person or persons knowingly making any false statements in the consular invoice, or in the affidavit, or in the pro forma invoice, or during the examination by the collector as to such affidavit and pro forma invoice, is punishable by a fine not exceeding five thousand dollars, or by imprisonment for two years, or by both such fine and imprisonment, in the discretion of the court, to say nothing of the forfeiture of the importation which may follow a false declaration.

. True, the statements of the invoice do not finally conclude the collector, but to say that such a document, hedged about as it is by sanctions and safeguards to secure correctness, has no evidentiary value whatever in the absence of better evidence as to the tariff status and dutiable value of merchandise, is to say that Congress did a useless thing and required a document to supply information to the collector for official purposes which was not even weak prima facie evidence of that which it stated.   Not only is the invoice prima facie evidence of that which it declares, but unimpeached and not mistrusted or discredited, it is *the* evidence which determines the collector's action as to all imported merchandise which has not been examined.   But one package of every invoice and not less than one out of every ten packages is examined and, unless that examination raises a doubt as to the truth of the invoice, the collector accepts, and the prompt dispatch of the customs business obliges him to accept, the invoice as evidence of the nature and character of the unexamined packages.   More than that, if the merchandise be destroyed before examination, the collector may have no other means of ascertaining the tariff status of the goods and the dutiable charges and fees thereon, and in such case he would of necessity be remanded to the invoice for the information which would enable

him to classify the merchandise and to fix the rate and amount of duty which should be assessed thereon. If the law contemplates that the collector may assess and collect duties on the declaration of an unimpeached invoice in the absence of better evidence, there is no reason apparent why the board and the courts should not accord to such an invoice, which by the way forms part of the record, like credit under similar circumstances, and that is what the board and the courts have done.

As early as 1822, Judge Story distinctly held in United States *v.* May (26 Fed. Cas. 1224), "that where the invoice contains a charge of commissions in the usual cases, this is *prima facie* sufficient for the importer. * * * It is not to be presumed that the importer will swear to a charge that is known to him to be incorrect.". In that case it was held that certain commissions were not a part of the invoice value and that they might be allowed to the importer on the faith of the certified statements of his invoice.

In T. D. 3455, under date of January 18, 1878, the Treasury Department ruled that—

In the absence of evidence to the contrary, it should be assumed that the invoice was prepared in accordance with the provisions of the law requiring that all invoices shall be made out in the weights or measures of the country or place from which importation is made, and shall contain a true statement of the actual weights or measures of such merchandise, without respect to the weights or measures of the United States.

That the invoice is controlling in the absence of evidence to the contrary was held by General Appraiser Somerville in T. D. 16647; G. A. 3292, and again in T. D. 24780; G. A. 5472. The decision last named was affirmed by the circuit court in United States *v.* Lahey & Duncan (132 Fed., 181).

In Stein *v.* United States (1 Ct. Cust. Appls., 478; T. D. 31525), it was contended that the court having held the appraisement invalid erred in directing that liquidation be had on the invoice values. On rehearing, the Government abandoned that contention, however, and the duties were liquidated upon the invoice values.

In Erhardt *v.* Schroeder (155 U. S. 124, 130, 131), which involved the legality of an appraisement, the court said:

The question of the value of the goods could not be raised in an action against the collector, and an attack upon the legality of the appraisement, for the purpose of having it declared illegal, and the goods therefore declared dutiable *at the value stated in the invoice,* would be the only means of redress by a court for an illegal exaction of duties based upon an erroneous valuation.

Discussing an action against the collector for duties illegally exacted, the court further on in the opinion said:

No question can be raised as to the value of the merchandise, except to show that because of some illegality in the appraisement the value fixed by the appraiser should not be taken as the basis of the duties, *but that the duties should therefore be fixed by the invoice.* (Italics are ours.)

Whether a new appraisement may be ordered in case the appraisement by the local appraiser, the general appraiser, and the Board of General Appraisers on final appeal has been declared invalid may or may not be an open question.   Certain it is, however, that up to date the collector, the Board of General Appraisers, sitting as a classification board, and the courts have recognized the invoice value in such cases as the value of the goods for the purpose of assessing an ad valorem duty thereon.

We must conclude, therefore, that customs laws have always contemplated that invoices in due form made in accordance with statutory requirements and not discredited or impeached were, in the absence of other proof, admissible as some evidence of the facts stated therein, and that the administrative practice and the judicial tribunals have conformed to that interpretation.   There was, therefore, in our opinion sufficient evidence to support the decision of the board.

The only other point to be considered is whether the board should have remanded the cases to the collector with directions to reliquidate in conformity with the board's opinion.

We do not think that the board was required to take that course, in view of the fact that it affirmatively appears that neither the collector's office nor the importers had any samples of the importation or samples of like merchandise other than those designated by the numbers 4044, 6110, 4702/5020.   From that it would seem that the collector was in no better position to determine the yarn count of the goods in controversy than was the board.   No samples having been retained as required by article 646 of the Treasury Regulations (1915) and no other samples being available, it was evidently impossible for the collector to verify by examination the statutory yarn number or count of the goods, and therefore, unless he arbitrarily fixed the yarn count, he would be compelled to accept the statements of the invoice, the verity of which was unassailed.   Moreover, the invoice, with no presumption against it, was some evidence before the board of the facts therein alleged and cast the burden on the Government of showing that the invoice was not correct, and such showing was not made.

In the Lord & Taylor case (8 Ct. Cust. Appls., 345; T. D. 37610) the board *did not determine the average number of the yarn*, but merely held that the fabrics were dutiable at the appropriate rate under paragraph 252.   On that finding the case went back to the collector, who reliquidated the entry at the highest rate provided in paragraph 252; that is to say, on an average yarn number of 99.   The collector expressly based his ruling not on ascertainable facts, but upon the fact that the board had failed to find the yarn number and the other conditions necessary to determine the appropriate rate of duty.

That reliquidation was protested, and on the hearing before the board the importers contended that it was the duty of the collector to accept as true the invoice description of the merchandise and to reliquidate the entries accordingly. There was nothing in the record showing or tending to show that there were no samples of the goods or of like goods available to the collector for the determination of the proper rate and amount of duty. The board overruled the protest, and this court, on the ground that it did not appear that reliquidation could not be made on proper samples or other legally ascertainable facts, remanded the case with directions that reliquidation be had under paragraphs 252 and 253 of the tariff act of 1913.

It is patent that the facts in that case differ radically from those presented by the present appeal, inasmuch as the board in the pending controversy *found the yarn number and count on evidence properly before it,* whereas, in the Lord & Taylor case, supra, no yarn number or count was found. The collector, having before him no yarn number or count, reliquidated at the highest rate assessable on the goods, and as that decision was admittedly made without ascertaining the facts it carried with it no presumption of correctness. It is to be noted that the collector's reliquidation was not sustained by this court, and that the matter was remanded with directions to reliquidate according to law.

The decision of the Board of General Appraisers is *affirmed.*

### CONCURRING OPINION.

BARBER, Judge: The importers have established that the classification of the collector was wrong. They have also established that the merchandise is dutiable under paragraph 252. Under the circumstances set forth in the court's opinion I think the invoice possesses sufficient probative force to justify the conclusion that the judgment of the Board of General Appraisers should be affirmed, but I query if the invoice possesses probative force to the extent that the opinion might seem to indicate.